that competition, it was agreed between them that the sale should be on a joint account. No person is produced who. heard such a conversation between the two purchasers. There is no evidence to show that Mr. Morganthau, who made that statement, was at that time prepared to make any bid for the property, except his own affidavit, which will be considered in a moment, or that he was financially able to complete the purchase. The whole statement depends upon the understanding of those two gentlemen as to what Mr. Morganthau said, and Mr. Richards stated in court that, at the time that the statement was made, it did not impress him with the fact that anything wrong was done, but rather looked upon the remark as made in a boasting way. In answer to that, we have the affidavit of Mr. Morganthau, who made the statement, and Mr. Flake, to whom the statement was made, and several others who heard the statement that was made. By these affidavits it appears that, after Mr. Flake had commenced to bid, Mr. Morganthau asked him if he would give him an interest in the purchase if one was made, to which Mr. Flake agreed; that nothing was said about Mr. Morganthau bidding upon the property, and there was no agreement expressed or implied that Mr. Morganthau would not bid. And Mr. Morganthau expressly testifies that he was not prepared to bid more than $425,000 for the property, and that he would not have made a bid in excess of that sum, and that, as a greater sum was bid at the time, he would not have made any bids at all, and, as matter of fact, he did not make any bid either before or after the conversation took place. Unless the court is prepared to hold that in every case where two persons who attend a sale, prepared to bid, agree to purchase the property together, such a sale would be set aside, I do not see how I can set aside the sale in this case on the ground stated. There is not the slightest evidence to show that any one would have bid one dollar more for this property, had that agreement not been made, or that the agreement in any way affected the sale. I have examined the cases cited by the counsel for the moving party, but do not think it necessary that I should review them. The principle is quite well settled that while the court has supervision of such sales, and has power to set a sale aside where there is the slightest suspicion of fraud or deception practiced by the purchaser, or any one acting in his behalf, or by whose representations or acts he is bound, but where the purchaser (not a party to the action, and not connected with any of the parties) purchases a piece of property at a sale fully advertised, and made in accordance with the judgment, his right to complete his sale, and get the benefit of the bargain he has made, should not be taken from him, in a case where he is acting in entire good faith, merely because the parties to the action find that they have made a mistake in allowing him to purchase at the price that he did. I think, on the whole case, that I would not be justified in granting this motion, and it must therefore be denied, with $10 costs.

Argued before VAN BRUNT, P. J., and FOLLETT and PARKER, JJ.

A. Stickney, for appellant.
John M. Bowers, for respondents.

PER CURIAM. Order affirmed, with $10 costs and disbursements, on opinion of court below.

---

MILLER et al. v. MILLER et al.

(Supreme Court, General Term, Fifth Department. June 20, 1894.)

WILLS—DESCRIPTION OF BENEFICIARIES—EVIDENCE.
    On an issue whether testator intended to provide for M. or her children, under the description of the "wife and children" of J., his son, it appeared

that J. had a wife living at the time of trial. Improper relations had existed between M. and J., and she testified that they had cohabitated openly, and that testator recognized and treated the children as his grandchildren, and visited them frequently. She further testified that the man with whom she lived was the one whose picture was produced on trial, but three witnesses who knew J. testified that it was not his picture. No witness ever heard testator speak of M. or her children, or saw him at her house. *Held*, that M. and her children were not the persons testator intended to provide for as the "wife and children" of J.

Appeal from special term, Monroe county.

Action by Richard Miller and Mary Gorman against George W. Miller and others. There was a judgment in favor of defendants, and plaintiffs appeal. Affirmed.

The opinion of Mr. Justice RUMSEY at special term is as follows:

Upon the proofs there is hardly any claim that James M. Miller was ever married to Margaret Fitzhugh. Whatever might have been said upon that point when the plaintiffs rested their case, such a marriage was shown to have been impossible when it was made to appear that the alleged husband was then actually married to Eliza Jane Shepard, and that she was living at the time of the trial of this action. The principal part of the cause of action was therefore eliminated from the case, and the plaintiffs stand now upon their claim that Margaret Bell and her children are the wife and children of James M. Miller referred to in the will of Andrew Miller, and are the persons intended to be beneficiaries under that name. In considering this claim, we must start with the proposition that the wife of a man is the woman to whom he is legally married, where there is such a person, and that by the term "children" is meant, in its usual and ordinary significance, his legitimate descendants. Mowatt v. Carow, 7 Paige, 328; Shearman v. Angel, 1 Bailey, Eq. 351. In the highest English court it has been said and decided that the word "children," in a will, means, prima facie, "legitimate children,"—as much so as if the word "legitimate" had been introduced before it,—unless, when the facts are ascertained, some repugnancy or inconsistency would result from so interpreting it. The probable intention of the testator cannot be taken into account. Dorin v. Dorin, L. R. 7 H. L. 568. See, also, Paul v. Children, L. R. 12 Eq. 16. It is plain that the will contains no expression or description which will point to or identify Margaret Fitzhugh or her children as the persons referred to as the "wife and children" of James M. Miller. But the plaintiffs claim that, if there are no legitimate children, it is competent to prove the situation of testator's family to show that, in the particular case, he used the term "children" to mean natural children. If that rule is applied here the question will be, what has been made to appear with regard to Andrew Miller's knowledge of the relations between his son and this woman, and whether, from the facts so appearing, there arises any presumption that he intended to provide for them under the description of the "wife and children" of his son? While it is clear that there were improper relations between James M. Miller and Margaret Fitzhugh, in Rochester, in 1856, there is no evidence, except her own, that the person with whom she lived as her husband, there or in Hamilton, was James M. Miller, the son of Andrew Miller. Mr. David Jones knew James M. Miller, and he saw them together in 1862 or 1863, when they brought the plaintiff to W. I. Jones to be kept. It may be inferred from that testimony that the intimacy between James M. and Margaret still continued, and that he acknowledged that child as his. But, with that exception, not one witness was sworn, except the alleged wife, who, having known James M. Miller, could or did say that it was he who lived with this woman as her husband. They say that she was called Mrs. Miller, but their evidence as to her alleged husband entirely fails to identify him. Mrs. Roth saw him go there, but she never saw him to his face, and she did not know James M. Miller, and never saw the man she supposed was he until she saw him at Ontario street. Mrs. Kiernan saw the alleged husband there, but she never knew James M.

Miller, and cannot identify him. Mrs. Tierney never saw any man there. These are all the witnesses who speak of the association of James M. and Margaret. They all lived in Rochester, and they knew nothing of the life of these people in Hamilton. It is noticeable that they give no description of James M. Miller, and there is nothing to show that he was the person who lived with Margaret on Ontario street, so far as their evidence goes. They were not shown the picture which Mrs. Bell identified as that of the father of her children, and which hung in her parlor in her house in Hamilton. Whether or not it was James Miller with whom she lived on Ontario street, there is no pretense that his father, Andrew Miller, knew of the intimacy, or of the children, or anything about it. This is the only important matter with regard to that period of the lives of these two people, and this must all the time be borne in mind. But when we come to the life in Hamilton the evidence is still more meager. It is to be remembered that the plaintiffs try to show that this woman and James Miller lived in that city as man and wife for several years; that a family of children grew up there; that she was recognized as his wife; and that Andrew Miller knew all this, recognized these children as his grandchildren, and had that familiarity with and affection for them which raises a presumption that he had them in mind when he made his will, and intended to provide for them.

It is apparent from the evidence in the case that James Miller was well known in Hamilton. His father had property there, and spent much time in the city, as did James also. His brother lived there, with his family, at the very time that it is asserted that James and Margaret lived there as man and wife. It is strange that not one person of all those who must have seen these persons and Andrew Miller in the same house, and associating together, is brought here to prove it, if it took place. The plaintiffs say their cohabitation was open and notorious; that it was legitimate and proper, and so recognized by the parents of James; and yet not one person, of all in that city, is brought to swear that these people even lived together. It is a strange failure of proof on a vital point. So this important matter stands solely upon the testimony of interested witnesses, and, in the last analysis, the only evidence there is to show that the person with whom she lived in Hamilton was James Miller, or that the older man was Andrew Miller, is that furnished by Margaret Fitzhugh. Her oldest child, born in 1857, was only six years old when Andrew Miller died. None of the children pretend to say anything about him. They say that there was an old man there who paid some attention to them, but who he was they do not pretend to say. So with their father. They say a man was there whom they were told was their father. They saw him seldom. Those who describe him say he resembled the picture produced, and that they were told this was a picture of their father. All this amounts to nothing, aside from the testimony of Mrs. Bell. So the whole case of the plaintiffs, to bring them within the will, hinges on her testimony. Aside from the fact that she has a deep interest in this action, her character, as shown by this testimony, is not such as to enhance her credit. But that point need not be discussed. Her testimony is that James Miller lived with her, as her husband, in several houses in Hamilton,—part of them owned by his father. She says that the man who lived with her there was the man whose picture is produced on the trial. This picture was on the wall, and she said it was the picture of her children's father and told them so, and Richard swears it resembles the man whom he called his father. Mrs. Bell swears it was James M. Miller's picture, and that he gave it to her. Now, if there is anything established in this case, it is that that picture is not the portrait of James Miller. No one swears that it was, except Mrs. Bell. Mr. David Jones, a witness for the plaintiffs (the only one besides Mrs. Bell who knew James Miller), was not shown the picture. On the part of defendant, three men who knew James Miller testified that the picture was that of another man, and not of him. James Miller lived in Rochester many years. There were, I doubt not, a very large number of people in that city who could have told whether or not the picture resembled him, or was his portrait. As none of them were called, it is fair

to assume that the fact that it was his likeness was disproved.   The overthrow of that important part of Mrs. Bell's testimony strikes a fatal blow at her credibility.   If the man she lived with in Hamilton was not James Miller, the plaintiffs' case is at an end.   So, if she is wrong in her statement that the old man who played with the children in her rooms was Andrew Miller, the case miserably fails.   If the man she then lived with was not James, of course the old man was not James' father.   To suppose that he would visit his son's paramour while she was living with another man is absurd.   There is not one particle of evidence to support her claim that this old man was the testator.   No witness ever heard him speak of this woman or of these children.   No other person than she ever saw him there.   He made them no presents.   He was not with them in the street.   No one says he took them anywhere.   There is not one tittle of evidence that he knew them, except the testimony of this woman, discredited by her history, not probable in itself, and totally uncorroborated.   It is incredible that Andrew Miller should have visited these people so frequently and familiarly without some one of Mrs. Bell's friends seeing him there, or some one of his acquaintances hearing him speak of them.   In the absence of some testimony of this kind, or of some other kind, to bolster up the testimony of Mrs. Bell, I would not feel at liberty to accept it as decisive of an important case.   Unless it is accepted there is nothing to show that Mr. Miller knew of these children, or had any regard for them, or intended to refer to them when he made the devise for the benefit of the wife and children of his son James.   The plaintiffs' claim that they are beneficiaries under the will, therefore, falls to the ground.   When their case fails there can be no reason for giving them costs out of the estate.   They have no more right to bring an action for construction of the will of Andrew Miller₃than for the construction of the will of A. T. Stewart.   Indeed, the complaint alleges no such object.   The action is purely and simply to get one-half of Andrew Miller's estate.   The fact that they have failed to get what they prayed for affords no reason why the true owners of the estate should be compelled to pay to them a premium for their efforts to deplete it, by way of a bill of costs. Whatever claim these people might have had, in justice, to share in James Miller's estate, they surely have none in that of his father, who was in no way responsible for them or chargeable with them.   The award of costs must follow the usual rule.

Argued before DWIGHT, P. J., and LEWIS, HAIGHT, and BRADLEY, JJ.

M. F. Brown, for appellants.

Geo. W. Miller, for respondents.

PER CURIAM.   Judgment appealed from affirmed, with costs, on opinion of RUMSEY, J., at special term.   All concur.

---

(9 Misc. Rep. 235.)

### BLUMER et al. v. NATIONAL STARCH MANUF'G CO.

(Supreme Court, Special Term, New York County.   June, 1894.)

CONTRACTS—CONSTRUCTION—OPTION.
  Defendant agreed to furnish a plant to test plaintiffs' process for manufacturing yeast from the waste products of starch manufacturing, defendant to have the option of an exclusive license under plaintiffs' patents "until the expiration of 60 days from the time when the said experimental plant is in successful operation, and producing yeast * * * in sufficient quantity to enable [defendant] to put the same on the market, and test its availability."   *Held,* that the term of option commenced to run when the experiments showed the successful manufacture of yeast from the waste products, and not when the experimental plant was ready for making the tests.